1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8
9

Michael Murray,

10

Plaintiff

Case No.: 2:10-cv-00968-JAD-GWF

11

v.

12

Brian Williams Jr., Cheryl Burson, and
Tanya Hill,

**Order Dismissing Equal Protection Claim and
Denying Motion for Summary Judgment
[Doc. 56]**

13
14

Defendants

15
16

    This civil-rights and employment-discrimination action arises out of the termination of

17

Michael Murray's employment as a casework specialist in the Nevada Department of Corrections

18

(NDOC).  Murray pleads what the parties brief, and this court construes, as three federal claims

19

under 42 U.S.C. § 1983 and Title VII: a First Amendment retaliation claim, an Equal Protection

20

claim based on race and gender discrimination, and a constructive-discharge claim.[1]  Defendants

21

move for summary judgment on all three counts.  Murray asks to withdraw his Equal Protection

22

claim, but defends his remaining claims.[2]  Having carefully considered the record and law, I grant

23

Murray's request to voluntarily dismiss his Equal Protection claim, and I find that genuine issues of

24
25
26

    [1] *See generally* Docs. 1, 56, 58, 60.  The complaint does not contain numbered claims, but
describes the plaintiff's grievances, particularly at paragraphs 18, 19, 26, and 27.  *See* Doc. 1 at 4–5.

27

    [2] Doc. 58 at 15.

28

1

material fact preclude summary judgment on his remaining claims.[3]

**Background**

These facts are stated in the light most favorable to the plaintiff, who is the non-moving party, and will not serve as a finding of facts in the event this case reaches a jury.  Where the parties disagree as to material facts, their disagreement is addressed in the analysis sections below.

In February 2008, Michael Murray had worked at the NDOC's Indian Springs Boot Camp (ISBC) for six years.[4]  Brian Williams, the warden at Southern Desert Correctional Center (SDCC), instructed him to conduct classes for the benefit of SDCC inmates.[5]  Murray told his direct supervisor, Tanya Hill, that this was an illegal misappropriation of resources from ISBC.[6]  Sometime during that month, Murray also commented on the lack of diversity among ISBC drill instructors, who were mostly white males.[7]  Warden Williams responded by commenting on the number of pick-up trucks parked outside the ISBC; Murray took this response to imply bias against white, non-urban males.[8]

On March 13, Warden Williams gave Murray a "temporary reassignment for training" to SDCC.[9]  This was a 90-day transfer for cross-training.[10]  Murray contends he was cross-trained before the transfer and that no other ISBC employee was required to cross train.[11]  On April 2,

---

[3] The Court finds this motion appropriate for resolution without oral argument.  LR 78-2.

[4] Doc. 58-1 at 1.

[5] Doc. 58-1 at 1–2.

[6] Doc. 58-1 at 2.

[7] Doc. 58-1 at 2.

[8] Doc. 58-1 at 2.

[9] Doc. 58-1 at 1–2; Doc. 56-1 at 2.

[10] Doc. 58-1 at 2; *see* Doc. 56-1 at 2.

[11] Doc. 58-1 at 2.

2

Warden Williams issued a memorandum indicating that Murray was "fully trained."[12]  The next day, the plaintiff was assigned to an SDCC unit rather than returned to ISBC.[13]  Murray maintains that he received "conflicting instructions and orders" from Hill during this time.[14]

In June, Murray received a below-standard evaluation from Hill, to which he responded in a point-by-point written rebuttal.[15]  On July 2, Murray filed a complaint with the Nevada Department of Personnel Discrimination Unit because he believed that he was being isolated and discriminated against.[16]  Three months later, he was notified that the Unit could not sustain the complaint.[17]  On July 30, Murray filed a grievance for his below-standard performance evaluation, in which he expressed concern that he was under the ISBC's budget but was assigned by Warden Williams to work at SDCC.[18]  He intended this grievance to ultimately reach the Employee Management Committee, and he filed a charge with the Nevada Equal Rights Commission—both agencies outside the NDOC.[19]

In September, Murray received a standard evaluation, though it was barely standard.[20]  He filed a response claiming he was the victim of a hostile work environment.[21]  Later that month, Warden Williams notified Murray that he was permanently reassigned to SDCC.[22]  On December

---

[12] Doc. 58-1 at 2.

[13] Doc. 58-1 at 2.

[14] Doc. 58-1 at 2.

[15] Doc. 56-3 at 4–5; Doc. 56-2 at 2.

[16] Doc. 58-1 at 2–3.

[17] Doc. 58-1 at 3.

[18] Doc. 58-1 at 3.

[19] Doc. 58-1 at 3.

[20] Doc. 56-3 at 6; *see also* Doc. 56-3 at 65–69.

[21] Doc. 58-1 at 2; Doc. 56-3 at 71–73.

[22] Doc. 58-1 at 3.

20, the defendants were notified that Murray had filed a discrimination charge with the Nevada Equal Rights Commission and Equal Employment Opportunity program.[23]

In February and March 2009, Hill issued two written reprimands to Murray: one regarding a note about inmate grievances and one regarding inmate-review statistics.[24]  Murray filed grievances in response, which said that assigning him as one caseworker to over two units violated American Correctional Association standards.[25]  He argued that the reprimands were retaliatory actions for his EEO charges and for his administrative appeal regarding his transfer to SDCC.[26]  That April 3, the defendants gave Murray another negative performance evaluation for what Murray calls "unsubstantiated conduct" and his rightful use of sick leave.[27]  Murray again responded, this time stating that the bad review was in retaliation for his EEO filing.[28]  The defendants referred Murray to the Employee Assistance Program because of the stress he was experiencing.[29]

Murray states that he repeatedly asked Warden Williams and Burson to transfer him to other institutions, but they denied his requests.[30]  Warden Williams told Murray that he spoke with wardens at these other institutions and that they declined to take Murray; but Murray claims that staff members at High Desert State Prison and Florence McLure Women's Correctional Center told him they were eager to have him join them.[31]  On June 16, Murray found his working conditions

---

[23] *See* Doc. 58-1 at 3.

[24] Doc. 58-1 at 3; *see also* Doc. 56-2 at 4.

[25] Doc. 58-1 at 3–4.

[26] Doc. 58-1 at 4.

[27] Doc. 58-1 at 4.

[28] Doc. 58-1 at 3–4.

[29] Doc. 58-1 at 4.

[30] Doc. 58-1 at 4.

[31] Doc. 58-1 at 4.

1    "intolerable" and resigned.[32]

2                                    **Discussion**

3           Summary judgment is appropriate when "the pleadings, depositions, answers to

4    interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine

5    issue as to any material fact and that the movant is entitled to judgment as a matter of law."[33]  When

6    considering the propriety of summary judgment, the court views all facts and draws all inferences in

7    the light most favorable to the nonmoving party.[34]  If reasonable minds could differ on the material

8    facts at issue, summary judgment is not appropriate because the purpose of summary judgment is to

9    avoid unnecessary trials when the facts are undisputed.[35]

10          Once the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue

11   of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts

12   showing that there is a genuine issue for trial."[36]  The nonmoving party "must do more than simply

13   show that there is some metaphysical doubt as to the material facts";[37] he "must produce specific

14   evidence, through affidavits or admissible discovery material, to show that" there is a sufficient

15   evidentiary basis on which a reasonable fact finder could find in his favor.[38]  The Court may only

16   consider properly authenticated, admissible evidence in deciding a motion for summary judgment,

17   whose contents are alleged in a complaint and whose authenticity no party questions, but which are

18   not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to

19   _____

20          [32] Doc. 58-1 at 4.

21          [33] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

22          [34] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

23          [35] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *Nw. Motorcycle Ass'n v.*
24   *U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

25          [36] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

26          [37] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted);.

27          [38] *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson,* 477 U.S. at
     248–49.

28                                        5

1   dismiss" without converting the motion to dismiss into a motion for summary judgment.[39]

2   **I.        The State of the Evidentiary Record**

3           I start by determining what evidence I can consider in reviewing these motions for summary

4   judgment.  Litigants submitting summary-judgment motions, oppositions, or replies must ensure that

5   any evidence submitted with such briefs is properly authenticated and not merely appended to or

6   submitted with the brief.  The Ninth Circuit made it clear in *Orr v. Bank of America* that

7   "unauthenticated documents cannot be considered in a motion for summary judgment."[40]

8           Documents authenticated through personal knowledge must be attached to an affidavit

9   signed by a person with personal knowledge about the document—such as the drafter or signer of a

10   document, or the custodian of a document kept in the ordinary course of a business, depending on

11   the type of document and its particular relevance—or must include a properly authenticated

12   deposition transcript in which the same foundation was laid.[41]  This is the typical method for

13   authenticating contracts, business records, policy manuals, and other documents.  The Court will not

14   consider inadmissible hearsay—in an affidavit or elsewhere—to support or defeat summary

15   judgment.[42]  Under Rule 56(c)(4), "An affidavit or declaration used to support or oppose a motion

16   must be made on personal knowledge, set out facts that would be admissible in evidence, and show

17   that the affiant or declarant is competent to testify on the matters stated."

18           Each of defendants' exhibits is properly authenticated, with the exception of the last page of

19   Exhibit 2-4, which is Murray's response to Hill's 90-day notice to improve.[43]  It may be that this is

20   part of Hill's notice, but how it comes in as part of her properly authenticated notice is unclear.  I

21

22

---

23           [39]*Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).

24           [40] *Orr v. Bank of Am.*, 285 F.3d 764, 733 (9th Cir. 2002) (citations omitted).

25           [41] *Id.* at 11.

26           [42] *Kim v. United States*, 121 F.3d 1269, 1276–77 (9th Cir. 1997).

27           [43] *See* Doc. 56-2 at 16.

28

thus cannot consider Murray's response (Doc. 56-2 at 16) as part of this exhibit for summary-judgment purposes.

Murray's exhibits are likewise authenticated by personal knowledge, with the exception of the June 2009 doctor's letter from Dr. Louis Mortillaro regarding his work-related stress.[44]  Dr. Mortillaro's letter is not addressed to or CC'ed on Murray, and there is nothing to indicate why Murray would have personal knowledge of it.  I also cannot consider this exhibit (Doc. 58-1 at 5).

## II.      Request to Strike

Before reaching the claims on their merits, I next consider the defendants' reply-request to strike certain factual allegations from plaintiff's opposition and affidavit.[45]  Murray argues in both his opposition and his affidavit that he told Hill—before he was transferred in March 2008—that Warden Williams was misappropriating resources from ISBC when Warden Williams required Murray to conduct classes for SDCC inmates.[46]  But Murray's complaint does not state that he raised this issue until July 2008, when he filed a grievance regarding a negative evaluation he received.[47]  This is, in short, a matter of timing.

The defendants argue that Murray could have moved to amend his complaint—and that, instead, he failed to provide them with adequate notice of his new allegations.[48]  In essence, the defense argues that Murray is in violation of Federal Rule of Civil Procedure 8(a)(2), which requires the complaint to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."[49]  But the July 2008 grievance that Murray references in paragraph 11 of his

---

[44] Doc. 58-1 at 5.

[45] Doc. 60 at 14.

[46] Doc. 58 at 2; Doc. 58-1 at 2.

[47] Doc. 1 at 3 (paragraph 11).

[48] Doc. 60 at 14 (citing *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006)).

[49] *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).

7

complaint—a document authenticated by the defendants themselves at Exhibit 3-24—contains this statement:

> Fifth, when I was caused to 'cross-train', the administrators stated the intent is to have me available to help with the workload at SDSS. *As I expressed to CSSIII Hill after my evaluation in January of 2008, I believe this to be illegal.* I am assigned to the Indian Springs Boot Camp, which falls under the budget of the Indian Springs Conservation Camp. The Southern Desert Correctional Center is another, separate budget number. *To have someone assigned to one budget number work to the benefit of another budget number, is a misappropriation of state resources.* As such, this entire exercise is, at best, a waste and, at worst, a precursor to violating the law.[50]

A word search for "July 30, 2008" shows that the defendant's motion for summary judgment discusses Murray's July grievance at least 11 times.[51] Their motion also states, in reference to this grievance, that "[t]he alleged protected speech is *Plaintiff's disclosure of illegal misuse of an employee budgeted to another institution*."[52] It then goes on to cite "Complaint ¶ 11." It is plain from the defendants' own arguments and evidence that the complaint—as pled—put them on "fair notice of what the plaintiff's claim is and the grounds upon which it rests."[53] The Court thus should and does consider Murray's allegation that he engaged in protected speech before his transfer.

The motion to strike is not just factually meritless; it is also procedurally deficient. Federal Rule of Civil Procedure 12(f) permits courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The target of defendants' request to strike is not a pleading, but rather the contents of plaintiff's responsive motion and declaration. "Rule 12(f) cannot serve as the procedural vehicle for striking language contained in motion papers."[54] Because Rule 12(f) does not afford litigants a basis for moving to strike language outside the plaintiff's complaint, the defendants' request to strike is denied.

---

[50] Doc. 1 at 3 (paragraph 11 discusses the July 30, 2008, grievance); Doc. 56-3 at 109 (Exhibit 3-24); Doc. 58-1 at 7 (emphases added).

[51] *See* Doc. 56 at 8, 14, 21–23, 26–27, 29.

[52] *Id.* (emphasis added).

[53] *Pickern*, 457 F.3d at 968 (citation omitted).

[54] *Parker v. CMRE Fin. Svcs, Inc.*, 2007 WL 3276322, at *4 (S.D. Cal. Nov. 5, 2007) (citing *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885–86 (9th Cir. 1983) ("Under the express language of the rule, only pleadings are subject to motions to strike").

## III.     First Amendment Retaliation

The defendants seek summary judgment on three claims, beginning with First Amendment retaliation.  Since the Supreme Court's landmark decision in *Pickering v. Board of Education*, it has been "well settled that the state may not abuse its position as employer to stifle the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest."[55] The law, as it has developed under *Pickering*, requires a five-step test for state employee speech:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.[56]

I begin with the first prong: public concern.

## A.     Public Concern

"Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'"[57]  This is a question of law.[58]  As the parties here acknowledge, the "essential question is whether the speech addressed matters of public as opposed to personal interest."[59]  "Public interest is defined broadly" because this circuit applies a "liberal construction of what an issue of public concern is under the First Amendment."[60]  Courts must consider a statement's content, form, and context "as revealed by the whole record"—with

---

[55] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (internal quotation marks omitted) (discussing summary judgment on First Amendment retaliation).

[56] *Id.*

[57] *Demers v. Austin*, 746 F.3d 402, 415 (9th Cir. 2014) (quoting *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick v. Meyers*, 416 U.S. 138, 146 (1983))).

[58] *Eng*, 552 F.3d at 1070 (citing *Berry v. Dept. of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006)).

[59] *Id.* (quoting *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (internal quotation marks omitted)).

[60] *Id.* (quoting *Ulrich v. City & Cnty. of S.F.*, 308 F.3d 968, 978 (9th Cir. 2002); *Roe v. City & Cnty. of S.F.*, 109 F.3d 578, 586 (9th Cir. 1997)) (internal quotation marks omitted).

9

content being the most important factor.[61]  Protected speech does *not* cease to involve a matter of

public concern merely because a public employee "arranges to communicate privately with his

employer rather than to spread his views before the public."[62]  And as the Ninth Circuit wrote about

the hostile work environment created when administrators permit inmates to mistreat employees,

"the proper administration of our prisons generally is undoubtedly of great public interest."[63]

First, I must consider whether Murray's statement about illegal use of state resources is

protected speech in itself.  In *Pickering*, the Supreme Court held that "the question [of] whether a

school system requires additional funds is a matter of legitimate public concern"—and the

government employer there was not permitted to deprive a public-school teacher of the First

Amendment right to discuss this concern.[64]  If a government employer is misusing public

funds—and an employee raises this concern—this is all the more a matter of legitimate concern to

the community that provides those funds and trusts public servants to use them properly.  As the

Supreme Court further made clear in *Givhan* and in *Connick*, the fact that Murray chose to

communicate this concern with his supervisor does not displace the First Amendment's protection.[65]

I find that Murray's statements about illegal allocation of prison resources is protected speech.

Second, the defendants appear to agree that discussion of budgetary issues—and any

improper use of state funds—would not be protected speech because they argue that this speech was

---

[61] *Id.* (citations omitted) (internal quotation marks omitted).

[62] *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979) ("We decline to adopt such a view of the First Amendment.").

[63] *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006) ("Her assertions that inmates . . . engaged in sexually abusive behavior with respect to the female guards while the prison's administrators failed to take appropriate corrective measures is 'relevan[t] to the public's evaluation of the performance of governmental agencies.'").

[64] *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571 (1968)).

[65] *Givhan*, 439 U.S. at 415–16 (recognizing that First Amendment protections remain in place and do not alter the public-concern aspect of speech when an employee addresses his concern to his employer); *Connick v. Myers*, 461 U.S. 138, 146 (1983) (affirming this rule from *Givhan*).

10

"incidental to his challenge of the performance of his evaluation."[66]  By their motion for summary judgment, defendants urge the court to set aside the public aspect of Murray's speech because, when he filed his grievances, the budgetary concerns were a relatively small percentage of the total word counts he submitted.[67]  If the speech merely contained "passing references to [illegal use of resources] incidental to the message conveyed," the defense would be correct that this weighs against finding that Murray raised a public concern and in favor of finding a private concern.[68]

But the record as a whole readily supports Murray's contention that he believed he was the target of retaliatory conduct that began after his statement about illegal use of resources.  Murray's decision to respond at length to the critique of his professional performance does not rule out the possibility that the defendants were giving him bad evaluations because of his protected speech or that Murray believed his response was necessitated because the defendants were unhappy with his speech and were retaliating against him for it.  Defendants' incidental-speech argument is unpersuasive and does not preclude a finding that Murray addressed a matter of public concern.

**B.      Private Citizen**

The retaliation test's second prong requires the plaintiff to speak as a private citizen.  "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'"[69]  The Supreme Court's seminal ruling in *Garcetti v. Ceballos* distinguished "First Amendment claims based on government employees' work product" from First Amendment claims for "constitutional protection for their contributions to the civic discourse."[70]  If

---

[66] Doc. 56 at 21–23.

[67] Doc. 56 at 21–23.

[68] *Desrochers v. City of San Bernardino*, 572 F.3d 703, 711 (9th Cir. 2009) (quoting *Robinson v. York,* 566 F.3d 817, 823 (9th Cir. 2009)) (internal quotation marks omitted).

[69] *Id.* at 1071 (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126–27, 1127 n.2 (9th Cir. 2008)).

[70] *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006); *cf. Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 (9th Cir. 2008) (discussing Garcetti and state-employee speech).

1   the plaintiff's speech "fell within the scope of [their] job responsibilities," as in *Garcetti*, the

2   plaintiff cannot state a First Amendment retaliation claim.[71]  This is a mixed question of law and

3   fact.[72]

4         Defendants rely on an employee-conduct policy in arguing that Murray indeed had an

5   official duty to report the alleged budgetary misconduct.[73]  Under the heading "NEGLECT OF

6   DUTY," point y is "[f]ailure to report misconduct."[74]  Second, defendants point to the anti-

7   discrimination policy, which states that the Nevada Department of Corrections will "promptly

8   discipline" discriminatory conduct.[75]  This portion of the employee policy defines "hostile work

9   environment" as "a legal term for discriminatory conduct in violation of Title VII."[76]

10         Under *Garcetti*, an official duty as a "practical" matter is a task that the "employee actually

11   is expected to perform."[77]  As the Ninth Circuit has observed, "It makes no sense to permit the

12   [defendants] to: (1) forbid [Murray] from reporting [government] abuse; and then (2) claim that the

13   forbidden reporting was part of his official duties, and thus, not subject to First Amendment

14   protection against retaliation."[78]  The NDOC cannot stop Murray from speaking as a citizen by the

15   fiat of a vaguely written rule.  The NDOC policy may have required him to report Warden

---

[71] *See Garcetti*, 547 U.S. at 430.

[72] *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1071 (9th Cir. 2012) (citing *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1129 (9th Cir. 2008) ("[W]hether [speech] was given in her capacity as a private citizen or pursuant to her official job duties . . . is a mixed question of law and fact.").

[73] Doc. 56 at 24–25.

[74] Doc. 56-6 at 36–37.

[75] Doc. 56-6 at 31.

[76] Doc. 56-6 at 31.  Murray points out that the defense does not discuss his job description as a caseworker and argues that "misconduct is not defined, whose misconduct is not explained, and to whom the report must be made is not delineated."  Doc. 58 at 8.  He also argues that the definition of "discriminatory" does not include "retaliation."  Doc. 58 at 8.

[77] *Dahlia v. Rodriguez*, 735 F.3d 1060, 1081–82 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 1283 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006)) (internal quotation marks omitted).

[78] *Id.*

12

Williams's conduct, but the language of this policy is both vague and broad, and its meaning and application creates an issue of material fact. Even if the policy's meaning were clear, this circuit does not permit the NDOC to retaliate at will simply by creating a policy that requires its employees to report that retaliation. I therefore find that Murray was speaking as a citizen.

## C.    Adverse Employment Action

The third prong of the retaliation test asks whether there was an adverse employment action substantially motivated by the protected speech.[79] Murray alleges a long list of adverse actions: "involuntary transfer, denials of transfer requests, excessive scrutiny, ostracism, reprimands, and poor evaluations, together with intensification of the harassment every time he complained."[80] He also characterizes his resignation as a constructive discharge.[81] Warden Williams, Burson, and Hill argue that Murray "cannot show a sufficient proximity of time between the alleged protected speech and the alleged retaliatory action when considering all the facts."[82] They also highlight their efforts to help Murray improve his job performance by meeting with him and reviewing his evaluations with him, and they argue that certain defendants were unaware of certain disciplinary actions, so they could not have been retaliating based on that discipline.[83]

This question is purely one of fact.[84] Whether defendants could have retaliated based on Murray's disciplinary record misses his core argument: that he was retaliated against for protected First Amendment speech. Further, the defendants' arguments leave extensive and complex issues of material fact that are not appropriate for the court to decide. Any causal link between Murray's protected speech and his transfer; any casual link between his protected speech and his job

---

[79] *Eng*, 552 F.3d at 1070 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

[80] Doc. 58 at 9.

[81] Doc. 58 at 9. Murray also argues that temporal proximity between an employee's complaint of bias and an employer's adverse actions can establish a causal inference—a concept he apparently borrows, based on the cases he cites, from the Title VII context. *See id.*

[82] Doc. 56 at 26.

[83] Doc. 56 at 25–32 (discussing each incident of speech and retaliation).

[84] *Id.* at 1071.

evaluations, which dropped significantly for this three-time employee-of-the-month winner; and any casual link between his speech and other disciplinary actions turns in significant part on credibility determinations.  What was done, what was said, and whether the alleged on-going pattern of adverse actions was motivated by Murray's speech are all questions for a jury to answer.

### D.    Adequate Justification and the But-for Analysis

The final two prongs of the retaliation analysis are whether the defendants had adequate justification for treating Murray differently and whether defendants would have taken the adverse employment action even without Murray's protected speech.[85]  If the plaintiff carries his burden on the first three factors, the burden of proof shifts to the defendants to prove either one of the last two factors.[86]  If they prove either, they can avoid liability.  This last factor is a but-for analysis that draws from the Supreme Court's decision in *Mt. Healthy v. Doyle*.[87]  "In evaluating whether the employee's speech was a but-for cause of the adverse employment action, [the Court] must . . . assume the truth of the plaintiff's allegations."[88]  Liability should be avoided "on this ground only if the state successfully alleges, without dispute by the plaintiff, that it would have made the same employment decisions even absent the questioned speech."[89]

Defendants argue that, even if Murray carries his burden, they "would have taken the employment action even absent the protected speech."[90]  But Murray disputes whether the Warden

---

[85] *Eng*, 552 F.3d at 1070 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).  With respect to adequate justification, *Garcetti* recognizes that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."  *Garcetti*, 547 U.S. at 418.  This is ultimately a legal question, but answering it may require resolution of underlying questions of fact. *Eng*, 552 F.3d at 1071.

[86] *Id.* at 1071.

[87] *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

[88] *Eng*, 552 F.3d at 1071.

[89] *Id.*

[90] Doc. 56 at 32.

14

Williams, Burson, and Hill would have taken the same steps but-for his protected speech.[91]
Assuming the truth of Murray's allegations, as the court must, I find that this question is for the jury
to determine as the trier of fact in this case.[92]

### F.    Qualified Immunity

Defendants also argue that they are entitled to qualified immunity from liability in this case
becaues they are sued in their individual capacities.[93]  "Because qualified immunity is an immunity
from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously
permitted to go to trial."[94]  In *Saucier v. Katz*, the Supreme Court held that courts must (1) first
determine whether the plaintiff alleges facts that make out a constitutional violation and, if so, (2)
decide whether the right was "clearly established" when the defendant allegedly violated it.[95]  Eight
years later, the Supreme Court retreated slightly from its position in *Saucier* and held in *Pearson v.
Callahan* that courts can decide these questions in the order they choose.[96]  As *Pearson* affirmed,
immunity applies "unless the official's conduct violated a clearly established constitutional right."[97]

Murray alleges facts that may make out a constitutional violation—and, given the presence
of material factual issues, he defeats summary judgment in this regard.  This leaves the question of
whether the law on retaliation was "clearly established" and therefore put the defendants on proper

---

[91] Doc. 58 at 14.

[92] *Id.* (quoting *Wagle v. Murray*, 560 F.2d 401, 403 (9th Cir. 1977) (per curiam)) ("*Mt. Healthy* indicates the 'trier-of-fact' should determine whether the firing would have occurred without the protected conduct.")

[93] *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002) ("Government officials sued in their individual capacities under § 1983 may raise the affirmative defenses of qualified or absolute immunity."); *see also* Doc. 1 at 1.

[94] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (internal quotation marks omitted).

[95] *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (internal quotation marks omitted).

[96] *Id.* at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

[97] *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

15

1   notice—or whether the defendants lacked notice and thus are shielded from immunity.

2          Just this year, the Ninth Circuit issued a First Amendment retaliation opinion in *Demers v.*

3   *Austin* that significantly shifted this area of law in employees' favor, but *Demers* only applies to

4   academic speech.[98]  The key case on which both parties correctly rely here—*Pickering v. Board of*

5   *Education*—was decided by the Supreme Court in 1968.[99]  *Connick v. Meyers*, another seminal case,

6   was issued in 1983.  Even to any extent that the Supreme Court's decision in *Garcetti v. Ceballos*

7   may have shed new light on First Amendment retaliation, it did so in 2006, which predates the

8   earliest actions in this case by two years.  The applicable law is certainly "well settled."[100]  I find no

9   ambiguities that excuse the defendants from complying with First Amendment law.

10  **IV.    Equal Protection**

11         In his response to the motion for summary judgment, Murray "withdraws any retaliation

12  claim under the Equal Protection Clause."[101]  Federal Rule of Civil Procedure 41 recognizes a

13  plaintiff's right to dismiss claims without prejudice before the defense files an answer or moves for

14  summary judgment.  After summary judgment is sought, the voluntary-dismissal procedure changes:

15  the plaintiff must seek court approval of a Rule 41(a) motion.[102]  But with court approval, claims

16  may still be dismissed without prejudice.[103]  I therefore construe Murray's withdrawal of this claim

17  _____

18         [98] *See generally Demers*, 746 F.3d 402.

19         [99] The motions cite heavily to the Ninth Circuit's decision in *Eng*, a 2009 case that quotes *Pickering* at length.  *Eng* also relies on *Connick* and *Garcetti*.

20         [100] *Eng*, 552 F.3d at 1070 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)) (internal quotation marks omitted).

21

22         [101] Doc. 58 at 15.  Defendants cited Eighth Circuit case *Brown v. Henley* in their motion for summary judgment—under their Equal Protection discussion—and argued that the Supreme Court would decide in this case, in "its current term," whether Title VII is the exclusive remedy for

23  employment discrimination.  Doc. 56 at 42.  As the plaintiff correctly observes, the Supreme Court denied cert in this case in January 2013.  Doc. 58 at 16; *see also Brown v. Henley*, 133 S. Ct. 868

24  (2013).  The Court therefore is not concerned that any change in the disposition of the Eighth Circuit's decision in *Brown* will impact this case.

25         [102] *Concha v. London*, 62 F.3d 1493, 1506 (9th Cir. 1995) (citing Fed. R. Civ. P. 41).

26         [103] *See id.* (citing Fed. R. Civ. P. 41).

27

28                                                    16

as a request for voluntary dismissal, and dismiss Murray's Equal Protection claims without prejudice.

## V.    Constructive Discharge

I now turn to the third and final claim challenged by defendants' motions.  Constructive discharge occurs when an employee resigns because of "unendurable working conditions."[104]  This is an objective test—looking to the reasonable person in the employee's position—and it examines the totality of the circumstances.[105]  Establishing constructive discharge requires a plaintiff to show at least "some aggravating factors, *such as* a continuous pattern of discriminatory treatment."[106]  The question of whether a work environment was "so intolerable and discriminatory" that resignation was justified "is normally a factual question left to the trier of fact."[107]

Material factual disputes exist as to the nature of the work environment in which Murray worked.[108]  The constructive-discharge question turns on factual findings like whether Murray was harassed by his temporary transfer—and, ultimately, by his permanent transfer—or whether his performance reviews were unfairly negative and designed to force him out of his job.  As is usually the case in constructive-discharge cases, these questions belong to the trier of fact.  Summary judgment is denied on this claim.

---

[104] *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted).

[105] *Id.*; *Thomas v. Douglas*, 877 F.2d 1428, 1434 (9th Cir. 1989) (citing *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987)).

[106] *Id.* (citing *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987)) (emphasis added in *Watson*).

[107] *Id.*

[108] *See supra* at Part III.C.

17

**Conclusion**

Accordingly, and with good cause appearing,

It is hereby ORDERED that plaintiff's Equal Protection claim is **DISMISSED** under Federal Rule of Civil Procedure 41(a)(2), each side to bear its own fees and costs; and

It is further ORDERED that the motion for summary judgment **[Doc. 56] is DENIED**.

The motion hearing scheduled for October 6, 2014, at 11:00 AM is **VACATED**.

DATED September 11, 2014.


_____
Jennifer A. Dorsey
United States District Judge

18